**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION**

**WILLIAM RAY HUGHES**                                                **PETITIONER**

**V.**                                                **CIVIL ACTION NO.: 2:05CV51-SA**

**CHRISTOPHER EPPS, ET AL.**                                                **RESPONDENTS**

**MEMORANDUM OPINION AND ORDER**

William Ray Hughes is an inmate confined to the Mississippi Department of Corrections who has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the otherwise final capital murder conviction and sentence of death imposed on him by the Circuit Court of Tate County, Mississippi.

**Facts and Procedural History**

Sixteen year-old Ashley Galloway was last seen alive getting into a black pick-up truck at 7:30 a.m. on January 9, 1996. When she did not report to school that morning or come home that evening, her mother contacted law enforcement officials. A search began for Ashley the next day. On January 22, 1996, Ashley's body was discovered underneath the floor boards of an abandoned house. An autopsy performed on the body revealed that Ashley had died of manual strangulation and stab wounds to the abdomen, and that she had been raped. Multiple bruises were found on her face, torso, and limbs, and she also sustained multiple injuries to her genital area. A groove was found over the front, left and right sides of her neck, and her neck showed extensive bruising. Additionally, there was a burned area of skin on the left side of her chest in which two stab wounds were located, and there were stab wounds measuring seven or eight

centimeters deep to her abdominal area. All of the injuries to Ashley's body were determined to have occurred prior to her death, with the exception of the burning to her chest, which occurred post-mortem.

On March 27, 1996, Panola County landowner, Jimmy Lewallen, discovered Ashley's class ring on his property. Using a metal detector, police found a second ring of Ashley's, and a dinner knife was also found. Across the street from Mr. Lewallen's property was the home of William Ray Hughes, a known sex offender. Investigators went to the Hughes home and learned that Petitioner lived there along with Julie Hughes Sanders and her two children. Julie had been married to Petitioner's father, who had died the previous year. Julie and Petitioner were lovers. The investigators were told that Petitioner was at work at Aluminum Extrusions in Senatobia, Mississippi, which is approximately 1.2 miles away from where Ashley was last seen getting into a pickup truck. The investigators went to Petitioner's place of employment and requested that Petitioner follow them to the police station. Petitioner agreed.

Petitioner was interviewed, and he stated that he sometimes drove Julie Hughes Sanders' black Ford Ranger to work. He also stated that he had not missed any work days in the month of January. At the request of an investigator, Petitioner consented to the taking of blood, saliva, and hair samples. These samples were later delivered to GenTest laboratories for DNA testing. Petitioner also consented to the search of his house and vehicles.

A check of the employment records at Aluminum Extrusions showed that Petitioner arrived at work at 6:00 a.m. but left sick at 7:31 a.m. on January 9, 1996, and that he missed work the next three days. Investigators also learned that one of Petitioner's work uniforms was missing, and they obtained a statement from Julie Hughes Sanders that Petitioner returned home

2

at 6:45 p.m. on the day of Ashley's disappearance with blood on his pants. The DNA sample taken from Petitioner was later determined to have the same characteristics as semen samples taken from Ashley's body, and he could not be excluded as a source of the semen. Seven genetic markers yielded results, and Petitioner was match on all seven. The statistical probability of this match on the markers occurring randomly in the population is 1:86,000 white males.

Witness, Stella Rowe, contacted authorities after she saw Ashley's picture in the paper on January 24, 1996, and she reported that she had seen Ashley around 12:50 p.m. on January 9, 1996, about two miles from where Ashley's body was found. Ms. Rowe stated that she came upon a small black pickup as she was traveling on Simpson Road, with a young female leaning out of the driver's side window waving her arms as Rowe passed. After she saw Petitioner's picture in the newspaper, she again contacted authorities and told them that Petitioner was driving the small black pickup she had seen on January 9, 1996.

Petitioner was indicted for capital murder while engaged in the crime of kidnapping and forcible rape, and he was charged as an habitual offender on both counts based on his previous convictions for rape and fondling. Petitioner presented a mistaken identity defense, and he presented a witness who testified that she had seen Ashley alive on January 11, 1996.

After deliberating almost three hours, the jury found him guilty of capital murder and rape. At the sentencing hearing, the jury learned Petitioner had prior convictions for the rape of a seven year old child in 1979, child fondling in 1988, and fondling as an habitual offender in 1990. The jury sentenced Petitioner to death after deliberating for two hours and ten minutes for the murder of Ashley Galloway during the commission of a kidnapping.[1] The Mississippi

---

[1] Petitioner was sentenced to life imprisonment on the rape charge.

Supreme Court affirmed the trial court. *Hughes v. State*, 735 So.2d 238 (Miss. 1999), *cert. denied*, 528 U.S. 1083 (2000). Petitioner sought post-conviction relief, which was denied. *Hughes v. State*, 892 So.2d 203 (Miss. 2004), *cert. denied*, 545 U.S. 1130 (2005). Petitioner filed a petition for writ of habeas corpus in this Court on February 8, 2006, alleging thirteen separate claims of error. After partially granting Petitioner's request for discovery and granting his motion to expand the record, the Court entered an order setting an evidentiary hearing on Petitioner's claim of mental retardation. Prior to the hearing, Respondents filed a notice conceding that Petitioner has mental retardation and is exempt from execution. The Court will grant relief on Petitioner's claim of mental retardation. The remaining claims are dismissed with prejudice or dismissed as moot for the reasons set forth below.

## Applicable Law

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996). Pursuant to the AEDPA's scope of review, habeas corpus relief cannot be granted in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); and 28 U.S.C. § 2254(d)(1) & (2). The factual findings of the State court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) have been held to have independent meanings. *See, e.g., Bell v. Cone*, 535 U.S. 685, 694 (2002); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *See also Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry, and it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Williams*, 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

Habeas relief does not generally lie for rules of constitutional law which have not been announced or that were announced after the challenged conviction became final on direct review. *See Teague v. Lane*, 489 U.S. 288, 310 (1989). A new rule is not retroactively applied unless the United States Supreme Court holds the rule to be retroactive. *See Tyler v. Cain*, 533 U.S. 656, 663 (2001). It is a violation of the principles of *Teague* for a federal court to create new constitutional rules on habeas review. *See Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001).

A petitioner must exhaust his remedies in State court prior to seeking federal habeas

relief.  *See Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); 28 U.S.C. §2254(b)(1).  A petitioner has exhausted his claim when he has fairly presented the claim for which he seeks relief to the highest court of the State.  *See Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004).  The federal claims presented for habeas relief must be the substantial equivalent of those presented to the State court in order to satisfy the requirement of fair presentation.  *See Morris*, 379 F.3d at 204-05; *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999).  A claim is not exhausted for purposes of federal habeas review if a petitioner presents the federal court with different legal theories or factual claims than those pursued in State court.  *See Wilder*, 274 F.3d at 259 ("[W]here petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement."); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001).  A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); s*ee also Mercadel v. Cain*, 179 F.3d 271, 276 (5th Cir. 1999).

Where a petitioner fails to exhaust his State remedies, but it is clear that the State court to which he would return to exhaust the claim would find the claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas corpus relief.  *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995).  Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and

adequate State law grounds.  *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar

federal habeas claims because the prisoner had failed to meet a state procedural requirement.  In

these cases, the state judgment rests upon independent and adequate state procedural grounds.");

*Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977).  In order to receive federal habeas review of

procedurally defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice

attributable thereto,' or demonstrate that failure to consider the federal claim will result in a

'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted).

In order to demonstrate cause, a petitioner must show "some objective factor external to

the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v.

Carrier*, 477 U.S. 478, 488 (1986).  Prejudice may be demonstrated by showing that the errors

"worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with

error of constitutional dimensions."  *Id.* at 494 (internal quotations omitted).  If a petitioner is

unable to demonstrate cause and prejudice, he may obtain review of his claim by demonstrating

that the application of the procedural bar would result in a miscarriage of justice because he is

actually innocent of the crime.  *See House v. Bell*, 547 U.S. 518, 537-38 (2006).  An allegation of

actual innocence requires that a petitioner support his claim "with new, reliable evidence that was

not presented at trial and show that it was more likely than not that no reasonable juror would

have convicted him in light of the new evidence." *Fairman v. Anderson*, 188 F.3d 635, 655 (5th

Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Where a State court holds a claim barred on independent and adequate State law grounds

and reaches the merits of the claim in the alternative, the bar imposed by the State court is not

vitiated.  *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Hughes v. Dretke*, 412 F.3d 582,

592-93 (5th Cir. 2005) (alternate holding on merits by state court did not preclude imposition of bar on federal habeas review for petitioner's failure to contemporaneously object on federal constitutional grounds in State court); *Thacker v. Dretke*, 396 F.3d 607, 614 (5th Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

Finally, the Court notes that the AEDPA imposes the burden of obtaining an evidentiary hearing in federal court on the petitioner, and it limits the circumstances in which an evidentiary hearing may be granted for those petitioners who fail to diligently seek to establish the factual bases for their claims in state court. *See Williams*, 529 U.S. at 433-34 (prisoners at fault for deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2). Even where an evidentiary hearing is not precluded due to a petitioner's lack of diligence, the decision to grant an evidentiary hearing is discretionary. *See, e.g., Clark,* 202 F.3d at 765-66. In order to be entitled to an evidentiary hearing in federal court, a petitioner must demonstrate that he was denied a "full and fair hearing" in State court and persuade the Court that his allegations, if true, would warrant relief. *Id.* at 766 (citations omitted).

With the foregoing standards in mind, the Court turns to Petitioner's specific claims for relief.

## I. Mental Retardation

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the United States Supreme Court held

that the execution of offenders with mental retardation[2] is proscribed by the Eighth Amendment to the United States Constitution. The Court found that due to the necessarily reduced culpability of persons with mental retardation, the dual societal purposes of deterrence and retribution would not be served by their execution. *Atkins*, 536 U.S. at 319-20. The *Atkins* Court cited with approval the American Association on Mental Retardation (AAMR)[3] and the American Psychiatric Association (APA) diagnostic criteria for mental retardation, but left it to the individual states to adopt a means of enforcing the constitutional restriction.[4] *See id.* at 317.

There are three components for a determination of mental retardation under either the AAMR or the APA standards: (1) substantial limitations in intellectual functioning; (2) significant limitations in adaptive skill areas; and (3) manifestation of those limitations before age 18. *See Clark v. Quarterman*, 457 F.3d 441, 446 (5th Cir. 2006); *see also Atkins*, 536 U.S. at 309 n.3 (noting similarity between the professional standards).

The definition of the AAMR provides that:

> Mental retardation relates to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable

---

[2] The American Association on Mental Retardation ("AAMR") is now the American Association on Intellectual and Developmental Disabilities ("AAIDD"). The AAIDD currently uses the term "intellectual disability" instead of mental retardation. For purposes of continuity and clarity in this opinion, the Court uses the term "mental retardation" and will refer to the professional organization as AAMR.

[3] The AAMR is now the American Association on Intellectual and Developmental Disabilities (AAIDD). The Court retains the use of "AAMR" throughout this opinion for purposes of clarity.

[4] The *Atkins* court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318.

> adaptive skill areas: communication, self-care, home living, social skills,
> community use, self-direction, health and safety, functional academics, leisure,
> and work.  Mental retardation manifests before age 18.

AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992)
("*1992 AAMR*").

The APA states that:
> The essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant
> limitations in adaptive functioning in at least two of the following skill areas:
> communication, self-care, home living, social/interpersonal skills, use of
> community resources, self-direction, functional academics, work, leisure, health,
> and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).

The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*
41 (4th ed. 2000) ("*DSM-IV-TR*").

In May 2002, the AAMR released a 10th edition that modified its definition of mental

retardation: "Mental retardation is a disability characterized by significant limitations both in

intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical

adaptive skills.  This disability originates before age 18."  American Association on Mental

Retardation, *Mental Retardation: Definition, Classification and Systems of Supports* 1 (10th ed.

2002) ("*2002 AAMR*").[5]

In response to *Atkins*, the Mississippi Supreme Court set forth the standard for how

*Atkins* is applied in trial courts in *Chase v. State*, 873 So.2d 1013, 1028-29 (Miss. 2004).

Pursuant to the *Chase* standard, a determination of mental retardation is to be made by the trial

judge, by a preponderance of the evidence, after evidence is presented by both the defendant and

---

[5] The 2002 *AAMR* also instructs that "significant limitations in adaptive behavior" are
"performance that is at least two standard deviations below the mean of either (a) one of the
following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score
on a standardized measure of conceptual, social, and practical skills."  *Id.* at 14.  Though not
cited in this opinion, the Court notes that the most current edition of the manual is *Intellectual
Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010).

State.  *Id.*  The Mississippi Supreme Court held that:

> no defendant may be adjudged mentally retarded for purposes of the Eighth
> Amendment, unless such defendant produces, at a minimum, an expert who
> expresses an opinion, to a reasonable degree of certainty, that:
> 1. The defendant is mentally retarded, as that term is defined by the American
> Association on Mental Retardation and/or The American Psychiatric Association;
> 2. The defendant has completed the Minnesota Multiphasic Personality Inventory-
> II (MMPI-II) and/or other similar tests, and the defendant is not malingering.  *Id.*
> *at* at 1029.

In *Chase*, the court also held that an offender may receive an evidentiary hearing on his

claim of mental retardation by presenting the court with an expert affidavit opining that the

defendant has a combined Intelligence Quotient (IQ) score of 75 or below, and that the defendant

will be found to be mentally retarded upon further testing.  *Id.*  Persons whose trials were final

pre-*Chase* may obtain an evidentiary hearing by attaching the above-described affidavit to the

application for post-conviction relief.  *Id.*

Petitioner presented his claim of mental retardation to the Mississippi Supreme Court on

post-conviction review, and the court rejected the claim and denied Petitioner an evidentiary

hearing.  The court noted that the trial court ordered Petitioner to undergo a forensic mental

evaluation prior to trial to determine whether he had "sufficient present ability to consult with his

attorneys with a reasonable degree of rational understanding in the preparation of his defense" and

"had the ability to know and understand the nature and quality of his acts.*"  See Hughes II*, 892

So.2d at 214.  In October of 1996, Petitioner was evaluated at the Mississippi State Hospital by

Dr. W. Chriss Lott.  The Mississippi Supreme Court noted that the evaluation included review of

Petitioner's prior evaluations and social services records, and that he obtained a full-scale I.Q. of

81 on the  Wechsler Adult Intelligence Scale - Revised ("WAIS-R") administered during the

evaluation.  *See id.* at 215.  The report from the 1996 testing results did not indicate Petitioner was

malingering, but it did indicate a gross exaggeration of symptoms of psychopathology. *See id.* Dr. Lott's forensic opinion was that Petitioner "was not suffering from a severe mental illness at the time of the alleged offenses." *See id.*

The court noted that Petitioner had presented the affidavit of Daniel H. Grant, Ed.D., a Georgia psychologist, who evaluated Petitioner in May of 2001, in support of his claim. *See id.* Based upon his evaluation, Dr. Grant concluded that Petitioner is mildly mentally retarded, with a reported full-scale IQ score of 64. *See id.* Dr. Grant also opined that Petitioner lacks normal adaptive skills and that his failing grades in high school demonstrate that his condition set in prior to the age of 18. *See id.* The Mississippi Supreme Court found Dr. Grant's affidavit insufficient, noting that his certification from the American Board of Forensic Examiners was "sharply criticized as a certificate mill" in an American Bar Association e-journal article in February 2000. *See id.* Citing the facts that Petitioner consistently received failing grades in high school, that he was not enrolled in special education classes, and the testimony that he was "a conscientious and reliable employee," the court rejected Dr. Grant's opinion and found that "[n]otwithstanding the technical compliance [with *Chase*'s requirements], the evidence of record in this case overwhelmingly belies the assertions that Hughes is mentally retarded." *Id.* at 216. Justices Dickinson and Cobb concurred with the majority's opinion concerning Petitioner's conviction but dissented regarding the majority's denial of Petitioner's claim of mental retardation without remanding it for an evidentiary hearing. *See id.* at 217-223.

This Court allowed Petitioner to expand the record to include two documents relevant to his claim. The first is a letter based on this Court's order granting in part and denying in part Petitioner's leave to conduct discovery for materials associated with the tests administered to

petitioner during his 1996 pre-trial evaluation. The second is a letter to counsel, dated June 19, 2007, from Gilbert S. Macvaugh, III, of the Forensic Services Department of the Mississippi State Hospital. (*See* Pet. Mot. Expand R., Ex. B). The letter confirms that Petitioner was provided copies of all of the documents in his file, but that the State could produce no raw testing data to substantiate the full-scale IQ score of 81 Petitioner received in 1996. (*See* Pet. Mot. Expand R, Ex. B). After reviewing the evidence before the Mississippi Supreme Court and the evidence produced in this Court in support of his claim, this Court ordered an evidentiary hearing on Petitioner's claim of mental retardation. On January 19, 2010, Respondents submitted a notice that their expert had evaluated Petitioner and determined that he has mental retardation.

The Fifth Circuit has held that "[a] prima facie showing of mental retardation is simply a sufficient showing of possible merit to warrant a fuller [exploration] by the district court." *In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006). In this instance, the Mississippi Supreme Court essentially required that Hughes be able to prove his ultimate claim as a precondition to a hearing on the issue. *See Hall v. Quartmerman*, 534 F.3d 365 (5th Cir. 2008) (emphasizing need for "full and fair hearing . . . where such a hearing would bring out facts which, if proven true, support habeas relief."). Petitioner presented the Mississippi Supreme Court with an expert opinion that he meets the definition for mental retardation in accordance with the procedure as set forth in *Chase*. Additionally, despite the discussion of malingering in the Mississippi Supreme Court's post-conviction opinion in this matter, Mississippi law does not require evidence on malingering as a predicate to obtaining a hearing on an *Atkins* claim. *See Chase*, 873 So.2d at 1029. Petitioner made a prima facie showing of mental retardation in state court. The state's failure to provide him with the due process opportunity to develop his claim deprives the decision of

deference normally due under 28 U.S.C. § 2254(d).  *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007).

Dr. Grant rendered his "clinical opinion, to a reasonable degree of psychological certainty, that [Petitioner] is mildly mentally retarded."  (Grant Aff. at 9, June 9, 2001).  On April 10, 2009, Dr. John R. Goff, a clinical psychologist, evaluated Petitioner, and he opines that "petitioner fully meets the definitions of mental retardation as recognized" by the AAMR and the APA.  (*See* Pet. Reply, Ex. A, Aff. of John R. Goff, May 14, 2009).  Dr. Gilbert Macvaugh, III, evaluated Petitioner over the course of three days in December of 2009 and determines that Petitioner "is mentally retarded as anticipated by the United States Supreme Court in *Atkins v. Virginia*, and the Mississippi Supreme Court in *Foster v. State*, *Chase v. State*, and *Lynch v. State*."  (Macvaugh Rpt. at 31).  In light of the unanimous opinion of the experts, the Court does not here engage in a detailed analysis of the evidence that would support or refute a diagnosis, but notes that it finds that proof exists in the record to support a determination that Petitioner has met each prong of the clinical criteria for a diagnosis of mental retardation by a preponderance of the evidence.

A.  Significantly subaverage general intellectual functioning

Petitioner's Intelligence Quotient ("IQ") has been measured on six known occasions using four successive versions of the Wechsler Adult Intelligence Scale ("WAIS").  The United States Supreme Court has recognized the Wechsler Scales as the "standard instrument in the United States for assessing intellectual functioning."  *Atkins*, 536 U.S. at 309 n.5.  The standard error of measurement for assessing IQ is approximately five points, according to the APA.  *See DSM-IV-TR* at 39.  Taking the standard error of measurement into account, the typical cutoff score for the intellectual functioning prong of the definition is an IQ between 70 and 75 or lower. *Atkins*, 536

U.S. at 309 n.5.  The Court notes the instances of Petitioner's intelligence testing and the results:

| Date | Examiner | Test | FSIQ[6] |
|------|----------|------|---------|
| 1979 | Dr. P. Griffin (Arkansas State Hospital) | WAIS | 72 |
| 1988 | V. Jenkins (MDOC) | WAIS-R | 67 |
| 1996 | N. Kobayakawa (MstateHospital) | WAIS-R | 81 |
| 2001 | Daniel Grant | WAIS-III | 64 |
| 2009 | John R. Goff | WAIS-IV | 63 |
| 2009 | Gilbert S. Macvaugh, III | WAIS-IV | 63 |

Petitioner has consistently scored within the accepted range for subaverage intellectual functioning, with the exception of the 1996 score, and that score cannot be substantiated through examination of the raw testing data.  This Court determines that Petitioner has demonstrated by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning.

B.  Significant limitations in adaptive functioning[7]

A diagnosis of mental retardation requires significantly subaverage general intellectual functioning "that is accompanied by significant limitations in adaptive functioning in at least two [] skill areas."  *DSM-IV-TR* at 41.  Significant limitations in adaptive functioning "refers to how

---

[6] The scores reported are Petitioner's unadjusted full-scale IQ scores.  Petitioner also presents an argument that his reported scores are actually lower because of the Flynn Effect.  The Flynn Effect refers to a statistical phenomenon that refers to an upward drift in IQ scores based upon the age of the intelligence test being used.  As the average of the scores falls within the accepted range and Respondents concede Petitioner's significant limitations in general intellectual functioning, the Court finds it unnecessary to address its application.

[7] All of the adaptive skill deficits found by the experts are not discussed herein, though the areas of deficits are recounted in each report/affidavit filed by the experts.

15

effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.* at 40. Persons with mild mental retardation can develop social, communication, and minimal sensorimotor skills at an early age such that they are not distinguished from normally functioning individuals until later in life. Harold L. Kaplan & Benjamin J. Saddock, *Synopsis of Psychiatry: Behavioral Sciences/Clinical Psychiatry* 1138 (8th ed. 1998). During their school years, persons with mental retardation can learn academic skills up to the sixth-grade level, approximately, and by their late teens and may be "guided toward social conformity." *Id.* As an adult, they can "usually achieve social and vocational skills adequate to minimum self-support but may need guidance and assistance when under unusual social or economic stress." *Id.* The definitions of the *DSM-IV-TR* and the 1992 *AAMR* use the same categories of skill areas to be considered.[8] These adaptive skill areas are (1) communication; (2) self-care; (3) home living; (4) social skills; (5) community use; (6) self-direction; (7) health; (8) safety; (9) functional academics; (10) leisure; and (11) work. *See, e.g.*, *DSM-IV-TR* at 41; 1992 *AAMR* at 5.

Dr. Grant, Dr. Macvaugh, and Dr. Goff all agree that Petitioner has significant deficits in the area of functional academics.[9] (*See* Grant Aff. at 7; Macvaugh Rpt. at 30; Goff Aff. at ¶ 17).

---

[8] The 1992 *AAMR* combines "health and safety" into one category while the *DSM-IV-TR* separates them into two categories. As such, the *AAMR* uses ten categories while the *DSM-IV-TR* references eleven. In 2002, the *AAMR* re-designated the skill areas into three categories: conceptual, social, and practical. 2002 *AAMR* 73. A clinician making a diagnosis using the 2002 edition determines whether the individual scores two standard deviations or more below the mean in one of the three adaptive behavior skill areas to determine if that individual's limitation is significant. *See* 2002 *AAMR* at 78.

[9] Dr. Macvaugh found that Petitioner has "clearly demonstrated conceptual deficits" as articulated in the 2002 *AAMR* definition. (Macvaugh Rpt. at 30). He notes that this would

Petitioner was socially promoted in school, he failed several grades, and he scored at least two standard deviations below the mean on his standardized testing examinations over the years. The affidavits of his family members also note that he was a slow learner, that he is functionally illiterate, and that special education classes were recommended for Petitioner during his school years. (*See* Aff. of Wanda Kay Hughes; Aff. of Carline Ingle; Aff. of Donald Hughes).

Dr. Goff and Dr. Grant opine that Petitioner also has significant deficits in the area of communication skills. (*See* Goff Aff. at ¶17; Grant Aff. at 7). Dr. Grant administered the Oral and Written Language Scales (OWLS) and the Expressive Vocabulary Test (EVT) to Petitioner to assess his communication skills, and his performance on both indicated that he has significant deficits in the area of communication. (Grant Aff. at 8). Dr. Goff administered the Adaptive Behavior Assessment System-Second Edition ("ABAS-II"), a standardized assessment, to Petitioner's sisters, Carla Ingle and Wanda Hughes. Petitioner's scaled communication scores based on the administrations of the ABAS-II placed him in the 1st and 5th percentiles, respectively, in the area of communication skills. (*See* Goff Aff. ¶¶ 12-14).

The reports and affidavits also note that Petitioner has never lived on his own. Dr. Grant administered the Independent Living Scale to Petitioner, who obtained a standard score of 66 on the scale. Dr. Granted noted that "[i]ndividuals who score within his range are not usually recommended for independent living." (Grant. Aff. at ¶ 14). One of Petitioner's siblings noted in her affidavit that Petitioner has never lived on his own, and Dr. Macvaugh reported that Petitioner informed him of the same. (*See* Aff. of Wanda Kay Hughes; Macvaugh Rpt. at 22).

---

correspond to his significant deficits in functional academics using the prior *AAMR* definition or current *DSM-IV-TR* definition. (*See id.*).

The Court also notes that Dr. Goff found significant deficits in the adaptive skill area of work, and Dr. Macvaugh noted that "all of [Petitioner's] previous jobs have consisted of menial or unskilled labor and can be performed by persons with mental retardation." (Macvaugh Rpt. at 30; Goff. Aff. at ¶ 17).

The Court finds Petitioner has met his burden of demonstrating by a preponderance of the evidence that he suffers from significant limitations in at least two adaptive skill areas identified by the *DSM-IV-TR* and the 1992 *AAMR*, and in at least one area as identified by the 2002 *AAMR*, prior to the age of 18.

C.  Onset "before age 18 years"

Dr. Grant, Dr. Macvaugh, and Dr. Goff all opine that the onset of Petitioner's mental retardation occurred prior to him reaching the age of eighteen. (*See* Aff. of Daniel Grant; Macvaugh Rpt.; Goff Aff. at ¶ 18). Petitioner's failing grades in school, his achievement testing scores, and his eligibility for special education classes support that determination. Petitioner has shown by a preponderance of the evidence that mental retardation was present before he turned eighteen years old.

D.  Malingering

Both Dr. Macvaugh and Dr. Goff adminsitered malingering measures to Petitioner. Dr. Macvaugh administered the Test of Memory Malingering and the Rey 15-Item Memory Test. (Macvaugh Rpt. at 26). Petitioner's scores on the TOMM suggested Petitioner's poor effort and a possible attempt "to malinger memory deficits," while his scores on the Rey 15-Item Memory Test did not suggest sub-optimum effort or an attempt to malinger (*Id.* at 26). Dr. Macvaugh notes that he could not be certain whether Petitioner was actually attempting to malinger, or

whether his low level of intellectual functioning produced a "false positive." (*See id.*). He opines, however, that Petitioner's intelligence and achievement scores are to be considered valid, as he put forth good effort during those tests. (*See id.* at 27). Dr. Goff administered the TOMM and the Computerized Assessment of Response Bias (CARB) to Petitioner, and he found Petitioner's scores "reflective of a straightforward performance and argue against any malingering." (*See* Goff. Aff. at ¶ 11). The Court determines, based upon the opinion of the experts, that Petitioner has satisfied the requirement to demonstrate that he is not malingering.

Petitioner has shown by a preponderance of the evidence that he satisfies the criteria for a diagnosis of mental retardation within the meaning of *Atkins v. Virginia* and *Chase v. State*, and he is entitled to have his sentence of death vacated.[10]

## II. Juror's Failure to Disclose

Petitioner argues that despite trial counsel's efforts to learn whether any potential jurors had been crime victims, one juror who had been raped failed to reveal that fact and was seated on Petitioner's jury. Each of the twelve jurors selected for Petitioner's trial completed a juror questionnaire that asked them to identify any crimes of which they had been a victim. None of the jurors selected for trial indicated that they or any member of their families had been crime victims, nor did they affirmatively respond to questions seeking to elicit such information during voir dire. Petitioner maintains that juror Neda Joe Cleveland, however, recalls that Juror X, whose job was cleaning tombstones, stated during sentencing deliberations that she had been raped as a child.

---

[10] In his federal habeas petition, Petitioner raised five additional claims relating solely to the sentencing phase of his trial. (*See* Pet. Memo, Claims VIII, IX, X, XI). Because the Court vacates Petitioner's sentence of death on the ground of mental retardation, these issues are rendered moot and will not be addressed in this opinion.

Iraida Lopez, a law student assisting counsel at the time of Petitioner's post-conviction proceedings, executed an affidavit stating that Juror X did not clean tombstones for a living, but that Juror Y indicated on her questionnaire that her profession involved cleaning tombstones. (*See* PCR Supp. Ex. 9, Aff. of Iraida Lopez, July 3, 2001). Ms. Lopez states that she did not interview Juror X about the allegation, as the notary had informed Ms. Lopez that Juror X had declined to execute an affidavit. (*See* PCR Ex. 9). Daniel Walworth, another law student assisting counsel at the time of Petitioner's post-conviction proceedings, executed an affidavit stating that he had interviewed Juror Y at the monument engraving business where she worked. (*See* PCR Supp. Ex. 7, Aff. of Daniel Walworth, July 3, 2001). Mr. Walworth states that Juror Y initially agreed to execute an affidavit stating that she personally observed Petitioner in shackles during trial, but that she refused to sign an affidavit upon his return with a notary. He maintains that Juror Y's husband also informed them that she no longer wished to speak to him. (*See id.*). Mr. Walworth states that he only later learned of Ms. Cleveland's statement, and that he did not return to ask Juror Y about being the victim of a rape in light of her earlier request. (*See id.*).

Petitioner contends that he is entitled to a new trial under the standard of *McDonough Power*, as the juror's failure to honestly answer the question would have provided defense counsel a valid for-cause challenge. *See McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984) (holding that a new trial is required where a litigant can demonstrate that a "juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."). Petitioner argues that under Mississippi's statutory law and case law, prejudice should be presumed from the juror's failure to respond to an unambiguous question where the juror knew the information sought to be elicited.

*See* Miss. Code Ann. § 13-5-67; *see also Odom v. State*, 355 So.2d 1381, 1383 (Miss. 1978) (holding that trial court should order a new trial if prejudice could reasonably be inferred from a juror's failure to respond to a relevant, unambiguous question and juror had substantial knowledge of the information sought to be elicited).  Petitioner argues that the summary declaration of the Mississippi Supreme Court's decision lacks the articulation necessary to afford deference under § 2254(d), but also that the state court's determination that he failed to make a substantial showing of the denial of a constitutional right is contrary to federal law.

Respondents note that the only evidence to support Petitioner's claim is a hearsay affidavit from an investigator from a hearsay juror.  Petitioner argues that insufficient proof exists only because the Mississippi Supreme Court refused his discovery requests, and that the rules of evidence allow testimony on the issue of whether extraneous prejudicial information was improperly brought to the jury's attention.[11]

On post-conviction review, the Mississippi Supreme Court noted that the affidavit provided by Petitioner was that of a third party, and that Mississippi Code Ann. § 99-39-27(5) provides:

> Unless it appears from the face of the application, motion, exhibits, and the prior record that the claims presented by such are not procedurally barred under Section 99-39-21 and that they further present a substantial showing of the denial of a state or federal right, the court shall by appropriate order deny the application.

*See Hughes II*, 892 So.2d at 216-17.  The court found that the affidavit "constitutes double hearsay and otherwise fails to make the required substantial showing of the denial of any right

---

[11] Pursuant to Mississippi Rule of Evidence 606(b), jurors are generally incompetent to testify concerning events that occur during jury deliberations.  *See Salter v. Watkins*, 513 So.2d 569, 571 (Miss. 1987).

guaranteed by the state or federal constitutions." *See id.* at 217.

Petitioner's maintains that he was deprived of a fair trial with an impartial jury due to the juror's failure to inform the court she had been the victim of a crime. The United States Supreme Court has held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *See McDonough Power*, 464 U.S. at 556. The Court will assume that whether a potential juror has been the victim of a violent crime is a material question, and it will also assume that the juror would have been struck for cause in this case had she admitted she was the victim of a rape. However, Petitioner has not demonstrated that a juror in his case was ever the victim of a rape; thus, he has not demonstrated a juror failed to honestly answer a material question.

Petitioner has offered only third-party affidavits to support his claim, and those affidavits do not even conclusively identify the juror alleged to have been the victim of a rape. Petitioner has not provided an affidavit from Ms. Cleveland, the juror who alleges she heard the juror's admission. He has failed to provide any proof that he attempted to contact any of the other jurors to question them and seek confirmation about Ms. Cleveland's allegation. The Court also notes that Petitioner has raised no allegation that any juror was influenced by the comment, if it did in fact occur. Petitioner has failed to demonstrate that the Mississippi Supreme Court's decision involved an unreasonable determination of facts in light of the evidence presented to it, and he has not demonstrated that the decision was contrary to, or involved an unreasonable application of, clearly established federal law. An evidentiary hearing is not warranted on this issue, and the claim shall be dismissed. *See Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (hearsay

affidavits in support of petition fail to provide factual basis for evidentiary hearing).

### III.  Ineffective Assistance of Counsel

A criminal defendant has the constitutional right to effective counsel.  U.S. Const. amend. VI, XIV.  In order to establish that he was denied the effective counsel, Petitioner must show that his attorney rendered constitutionally deficient performance that actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  This requires Petitioner to show (1) that counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms, and (2) that, but for counsel's deficient performance, the result of the proceeding would have been different.  *See id.* at 688, 695.  Judicial scrutiny of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance or sound trial strategy.  *See id.* at 668, 688-89.  Both the "deficiency" and the "prejudice" prongs must be satisfied, or it cannot be said that the adversarial process was so lacking that it rendered an unreliable result, thereby denying Petitioner a fair trial.  *See id.* at 687.  The Court considers Petitioner's claims of ineffective assistance with the foregoing standard in mind.

### A.  Trial Counsel's Failure to Challenge Testimony by State's Forensic Pathologist

At Petitioner's trial, pathologist, Dr. Steven Hayne, testified concerning the results of the autopsy he performed in this case on Ashley Galloway's body.  (*See* Trial Tr. vol. 7, 868-886). Petitioner maintains that Dr. Hayne's testimony advanced two critically important theories: (1) that Ashley was kidnapped and killed on January 9, 1996; and (2) that because the kidnapping began in Tate County, venue was appropriate as part of a continuous chain of events that led to the killing.  At trial, the State presented witnesses to demonstrate that Ashley was abducted on

January 9, 1996, and her body was discovered on January 22, 1996. Dr. Hayne testified that he could not conclusively determine when Ashley died, but that he "did not think that she had lived long after her disappearance in that there was no significant decomposition, autolysis or putrefaction identified on the remains." (*See* Trial Tr. vol. 7, 879). He testified it possible, though unlikely, that Ashley died up to seventy-two hours after her disappearance, and other witnesses testified that the weather must have preserved Ashley's body from decomposition. (*See* Trial Tr. vol. 7, 840, 851, 881-82; Trial Tr. vol. 10, 1317).

Petitioner maintains that trial counsel ineffectively failed to seek the assistance or opinion of an independent forensic pathologist prior to trial to investigate the historical weather data around the time of Ashley's disappearance to learn about the conditions to which Ashley's body had been exposed. Petitioner notes that the National Weather Service records establish that the temperatures were unseasonably warm between January 9 and January 22, 1996. Dr. Emily Ward, a forensic pathologist and former Mississippi State Medical Examiner, provided an affidavit in State court stating that Dr. Hayne could not have had a foundation upon which to base his opinion as to the window of death without an analysis of the weather records. (*See* PCR Ex. 3, Aff. of Emily Ward, June 1, 2001). Dr. Ward concluded that, due to the testimony Dr. Hayne gave concerning rigor mortis and organ measurements, Ashley's death must have occurred on or after January 19, 1996. Additionally, Dr. Ward opined, Dr. Hayne would not have been able to draw significant amounts of blood from the heart during autopsy had Ashley been dead for more than three days. (*See id*.).

Petitioner argues that if counsel had investigated, they would have been equipped to argue that Ashley died later than January 9, 1996, and demand that Dr. Hayne lay a foundation for his

assumptions about the body's preservation. Petitioner maintains that since he could provide an account for his whereabouts every day after January 12, 1996, evidence that Ashley was alive after January 12, 1996, would have destroyed the case against him. Testimony was given at trial that Petitioner's work records establish that he clocked out of work sick at 7:30 a.m. on January 9, 1996, and that he missed the next three days of work. (*See* Trial Tr. vol. 8, 1004-05). Petitioner maintains that his work records reflect that he otherwise maintained his normal work schedule.

Petitioner maintains that he presented meteorological and pathology evidence to the State court, but he argues that the court failed to consider the evidence. He argues that the court's failure to address the evidence means there is no finding to which § 2254(e)(1) presumption of correctness could attach or for which reasonableness review under § 2254(d)(2) would be appropriate. Moreover, he argues that finding Dr. Hayne's testimony "not paramount" is unreasonable in light of the facts and involved unreasonable application of law. He also argues that the decision was unreasonable as: (1) *Strickland*'s prejudice inquiry is not a sufficiency of the evidence test; (2) the court failed to consider the totality of the evidence and counsel's duty to investigate in addressing the deficiency prong; and (3) the court failed to address the adequacy of counsel's cross-examination in consideration of what effective counsel would have done after an adequate investigation.

Dr. Hayne and Dr. Michael West submitted affidavits on post-conviction review that conclude that Dr. Ward's finding are "contrary to currently accepted scientific and medical knowledge." (*See* R. Memo, Ex. D. and E). Dr. West opined that the cold weather accounts for the suspended rigor mortis in the body, as well as the absence of maggots. (*See* R. Memo, Ex. D.

at 3). Petitioner argues that neither of these are credible opinions, and that the unseasonably warm temperatures would have sped up decomposition.

On post-conviction review, the Mississippi Supreme Court considered Petitioner's claim that trial counsel was deficient for failing to adequately cross-examine Dr. Hayne and for failing to secure an independent expert to dispute the State's time of death evidence. *See Hughes II*, 892 So.2d at 209. The court stated it would consider whether Petitioner was denied a fair trial by the court's failure to grant him funds for an expert by considering "whether and to what degree the defendant had access to the State's experts, whether the defendant had the opportunity to cross-examine those experts, and lack of prejudice or incompetence of the State's experts," along with the extent to which the State's case depended upon the State's expert. *See id.* The court determined that the State's case against Petitioner "did not rise and fall on the evidence establishing the time of death." *See id.* Although Dr. Hayne opined that Ashley was likely killed within twenty-four hours of her disappearance, the jury also heard that Petitioner was seen with Ashley the day she died and that his DNA was consistent with the DNA found on Ashley's body. *See id.* The court found "more than sufficient evidence from which a reasonable juror could infer that Hughes had killed Ashley." *See id.* The court found counsel was not negligent in failing to seek an independent expert, and that he was not otherwise prejudiced. *See id.* In addition, the court noted that trial counsel elicited from Dr. Hayne the possibility that Ashley could have died as much as seventy-two hours after her disappearance. *See id.*

Petitioner makes an extensive argument for how the condition of Ashley's body when discovered on January 22, 1996, indicates that she was not killed on January 9, 1996; and therefore, why Petitioner could not have committed the crime. He faults counsel for not

challenging Dr. Hayne's testimony through an independent expert or through cross-examination. However, the "defense of a criminal case" does not "contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Dr. Hayne testified it is possible that Ashley died up to seventy-two hours after her disappearance. Even assuming, *arguendo*, counsel was deficient in failing to adequately challenge Dr. Hayne's testimony, he has not demonstrated it was unreasonable to determine that he was not prejudiced by the failure. While Dr. Ward would have given the jury another opinion to consider as to time of death, the information provided by Dr. Ward was not exonerating. Given the witness identifications, Petitioner's missing uniform, the contradictory testimonies concerning his whereabouts, and the DNA evidence produced at trial, Petitioner has not demonstrated that it was unreasonable to reject his *Strickland* claim. This claim shall be dismissed.

**B. Failure to Call Disinterested Witnesses**

During opening statements, defense counsel stated that the defense intended to call car salesman, Percy Pounders, to testify. Counsel stated that Mr. Pounders would testify that he saw Ashley and another person car shopping in Memphis "that day." (*See* Trial Tr. vol.6, 687-88). According to affidavits, Percy Pounders and Scott Mosier were Tennessee residents who would have testified that they saw Ashley Galloway at the car dealership where they worked on January 8 or January 9, 1996. (*See* PCR Ex. 25, Aff of Percy Pounders, May 3, 2001; PCR Ex. 26, Aff. of Scott Mosier, May 3, 2001). Subpoenas were issued for Percy Pounders and his colleague, Scott Mosier, but they issued from the Circuit Clerk of Tate County. Petitioner argues that trial counsel performed ineffectively in failing to seek their compulsory attendance at trial, as had the witnesses been properly subpoenaed, the jury would have learned that they each identified Ashley from a

photo spread produced by the FBI. Petitioner argues that other evidence would have eliminated the possibility that they saw Petitioner and Ashley on January 8, as Ashley's employment records at Sonic Drive-In in Senatobia indicate that she was working during the afternoon and evening hours that day. (*See* Trial Tr. vol. 6, 715). Petitioner maintains that trial counsel's unfulfilled promise to produce an exculpatory witness coupled with their failure to correctly subpoena him fell below the level of effective assistance, and that Petitioner was forced to testify as a result. Petitioner argues that counsel's failure also deprived the jury of credible evidence that would contradict the State's single-day theory, and it undermined the attorney's credibility with the jury.

In post-conviction proceedings, Petitioner produced the affidavits of Robert Scott Mosier and Percy Pounders, both of whom state that they identified Ashley Galloway from a photo spread as the person who came to Dobbs Brother's Auto in Memphis, Tennessee, with a male on January 8 or January 9, 1996. (*See* PCR Ex. 25 and 26). Each affiant states that they gave a statement to FBI agent Mark Gant on January 17, 1996, and that the contents of the FBI report attached to the affidavits are correct. (*See id.*). The FBI report for Pounders specifically notes that Pounders remembered that the female he saw at the dealership had the last name of Galloway, and that she and the man she was with were driving a blue Ford Ranger at the time. (*See* PCR Ex. 25).

The Mississippi Supreme Court considered Petitioner's claim that counsel performed ineffectively in failing to secure the attendance of Percy Pounders at trial, and it noted that Pounders could not remember whether it was January 8 or January 9 when he saw Ashley. *Hughes II*, 892 So.2d at 210. The court found that "[u]nless Pounders was to testify that he saw Ashley the day after the kidnapping and with someone other than Hughes, then his testimony is not nearly as crucial to establish an alibi defense." *See id.* The court found that defense counsel

28

produced the testimony of Sue Greenwood, who testified that she saw Ashley two days after her disappearance. *See id.* Noting that the jury was obviously not convinced by Ms. Greenwood's testimony, the court found that Petitioner could not demonstrate that Pounders' testimony would have changed the trial's outcome. *See id.* The court found the issue without merit and rejected the claim. *See id.*

The Court assumes that Pounders and Mosier did not appear because they were not properly subpoenaed, and that the failure to call them was not a matter of trial strategy. However, the Court finds that Petitioner has failed to demonstrate that it was not reasonable for the Mississippi Supreme Court to find that he was not prejudiced by the failure. The issue is whether, if counsel had secured the testimonies of these witnesses, the jury's "appraisal of [the petitioner's] culpability" might have been influenced, and whether "the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached. . ." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (internal citations omitted). This testimony would not have conclusively established anything, despite Petitioner's assertions to the contrary. While the Court notes that the testimony might have bolstered Petitioner's claim that Ashley could have been alive on January 9 in Memphis, neither individual can conclusively state that he saw Ashley on that date. Moreover, the prosecution had witnesses who identified Petitioner as the individual in the truck with Ashley, there was testimony that one of his uniforms was missing that purportedly had blood on it, he left work early on January 9, and he could not be excluded as the source of the DNA that was inside of Ashley's body. Additionally, the only evidence Petitioner has produced to demonstrate that he was forced to testify because Pounders did not appear is his own uncorroborated, self-serving affidavit. Finally, the Court notes that Petitioner has not shown

that counsel's credibility with the jury was undermined by the brief mention of the anticipated testimony so as to deprive him of the effective assistance of counsel. The passage cited by the Court was the only mention of the uncalled witnesses, and the brief reference does not demonstrate that his representation fell below reasonable professional standards, or that Petitioner was prejudiced as a result. This claim shall be dismissed.

## C. Failure to Challenge Admissibility and Accuracy of State DNA Evidence

At Petitioner's trial, DNA evidence was introduced to link him to Ashley's murder. Petitioner argues that trial counsel failed to properly support their motion to exclude the DNA evidence, and that their failure to present evidence to show that the testing did not meet the evidentiary requirements found in *Polk v. State*, 612 So.2d 381, 390 (Miss. 1992) constitutes ineffective assistance of counsel. In *Polk*, the court determined that the admissibility of DNA evidence is governed by a three-pronged test, which asks whether: (1) there is a theory, generally accepted in the scientific community, that supports the conclusion that DNA testing can produce reliable results; (2) there are current techniques, generally accepted in the scientific community, that are capable of producing reliable results; and (3) the testing laboratory performs the techniques without error in either performance or interpretation of the tests. *See* 612 So.2d at 390.

An evidentiary hearing was held on defense counsel's motion to exclude the DNA evidence. At the hearing, the State presented the testimony of Anne Montgomery, the associate director of GenTest Laboratories, which was commissioned by the State to perform the DNA analysis in this case. (*See* Trial Tr. vol.7, 247). After examination of Ms. Montomery was complete, defense counsel argued that the evidence did not meet the admissibility threshold, as the laboratory was not accredited or certified, that no standard governing techniques were employed

30

at the laboratory, and that Ms. Montgomery had been vague as to the error rate of the genetic profile "and some other matters." (*See* Trial Tr. vol. 7, 321-23). The trial court denied the motion. (*See id.* at 332-33). Initially, upon defense counsel's motion, the trial court approved the services of David A. Karlin to serve as the defense's DNA expert. (*See* SCP vol. 2, 214). After Dr. Karlin informed defense counsel that he was uncomfortable serving as an expert in this case with respect to his degree of expertise, Frances A. Chiafari was substituted as Petitioner's expert on August 30, 1996. (*See id.*). Mr. Chiafari did not testify at any stage of Petitioner's trial, and Petitioner maintains that is because he was not adequately consulted about the testing.

Petitioner argues that (1) the documents in the GenTests file establish that the laboratory failed to adhere to the relevant genetic testing guidelines in this case; (2) that there are more than twenty deviations from the protocols to which Ms. Montgomery claimed to have adhered to during testing; (3) and that Ms. Montgomery misrepresented who performed the analyses and verified the results of testing. Petitioner maintains that counsel failed to supply their own experts with the testing documentation they received, and that it is at least reasonably probable that the trial judge would have resolved *Polk*'s third factor against the state and excluded the DNA results at trial had the facts about the DNA work performed in this case been made known. In the alternative, he argues that even if it had been admitted, trial counsel would have been in a position to rebut the evidence had counsel properly investigated the testing. Petitioner maintains that regardless of whether it is an issue of ineffectiveness pre-trial or at the trial itself, confidence in the outcome of the trial has been undermined.

On direct appeal, the Mississippi Supreme Court discussed at length whether the trial court erred in denying Petitioner's motion to exclude the DNA evidence. *See Hughes I*, 735 So.2d at

270-272. The court noted that the DNA test performed in this case was a polymerase chain reaction (PCR), which it considered "a novel issue," as the court had only previously sanctioned the use of the DNA test known as Restriction Fragment Length Polymorphism (RFLP). *See id.* at 270. Noting that PCR is actually a "preliminary amplification method of copying the DNA and not the actual test, which is based on matching certain allele pairs," the court observed that it referred in the opinion to the entire process as "PCR." *See id.* at n.10. The court then determined that the admissibility of DNA evidence is governed by a three-pronged test, the *Polk* standard. *See id.* at 270 (citing *Polk v. State*, 612 So.2d 381, 390 (Miss. 1992)).

The court first noted that the theory upon which PCR testing is based is the same as that relied upon by RFLP testing. *See id.* at 270. That theory is that each cell contains DNA which is different with the exception of identical twins. *See id.* The court found it "clear" that the theory was generally accepted in the scientific community, as the State's expert in the field of molecular biology and DNA analysis noted that PCR testing had been used for many years and the markers used in the testing had undergone extensive research. *See id.* at 270-71. The court noted that numerous other courts had recognized PCR based testing as scientifically accepted, and that PCR testing for a "match" met the first prong of *Polk*. *See id.* at 271. The court also found that population frequency statistics should be allowed to show the frequency with which the match might occur in a given population. *See id.*

The court found that the second prong of *Polk* contains two discrete tests. One, the testing must be shown to be capable of producing reliable results; and two, the process by which the results are obtained must be generally accepted within the scientific community. *See id.* The court noted that, at trial, Ms. Montgomery testified concerning the safeguards against

contamination by foreign DNA. *See id.* at 272. The court noted that the controls explained by Ms. Montgomery, the positive, the negative, and the buffer, were the controls endorsed in *Polk*. *See id.* at 272. Ms. Montgomery also testified that the procedures were in compliance with the Technical Working Group on DNA Analysis Methods ("TWGDAM"), and that there was not then a national licensing or accreditation board or process for forensic testing, though she was personally a member of the Louisiana Association of Forensic Scientists and the Southern Association of Forensic Scientists. *See id.* at 272. She also explained that GenTest was then in the process of obtaining accreditation through the American Society of Crime Lab Directors Laboratory, and that while room for error in testing did exist, it was more probable to falsely exclude someone through human error than to falsely include them. *See id.* The court also noted that Ms. Montgomery detailed the handling of the incoming test samples and verified the use of two separate qualified persons to check the testing results, and the court determined that the GenTest procedures were compliant with *Polk*. *See id.* at 272.

Finally, the court considered whether the procedural safeguards in place were followed in this case. *See id.* The court determined that they were. *See id.* Ms. Montgomery testified that she followed the internal and TWGDAM procedures. *See id.* The court noted that although Petitioner had attacked the handling of the samples prior to their submission to GenTest, there was testimony to establish that a false exclusion was more likely than a false inclusion. *See id.* The court held that PCR meets the requirements of *Polk* and is viable in Mississippi Courts, and that the trial court did not err in denying Petitioner's motion to exclude the DNA evidence. *See id.*

On post-conviction review, the Mississippi Supreme Court considered whether trial

33

counsel ineffectively challenged the admissibility of the State's DNA evidence. *See Hughes II*, 892 So.2d at 210. The court noted that the admissibility of the DNA evidence was litigated at trial and on direct appeal and considered pursuant to the test set forth in *Polk v. State*, 612 So.2d 381, 390 (Miss. 1992). *See id.* at 210.[12] The court found the issue underlying the ineffectiveness claim procedurally barred, as Petitioner could not "recast the issue under the guise of ineffective assistance of counsel." *See id.* The court also considered Petitioner's claim that he was not provided the discovery material necessary to adequately challenge the State's DNA evidence and found the issue barred. *See id.* at 213.

In his federal habeas proceedings, Petitioner presents the affidavit of Randell T. Libby, a Ph.D. in molecular genetics, who has been recognized in various state and federal courts as an expert in forensic DNA analysis. (*See* PCR Supp. Ex. 2, Aff. of Randell T. Libby, June 22, 2001). Dr. Libby's affidavit questions many of the protocols followed by GenTest during its testing, and he opines that Petitioner was afforded "an incomplete defense" with regard to the challenge to the DNA testing in this case. (*See id*). Ms. Montgomery has also filed affidavits in response, and she states that her notes reflect that the defense was provided the original photographs of the testing results and a copy of the case file in November of 1996. (*See* R. Memo, Ex. G and H, Aff. of Anne Montgomery, February 13, 2002). She also states that the standard operating procedures were followed in Petitioner's case, and that any modifications that did occur did not have a harmful impact on the test results. (*See id.*).

---

[12] In 2003, Mississippi Rule of Evidence 702 was amended to require courts to apply the *Daubert* test to evaluate expert testimony. The court noted, however, that the trial judge in this case applied the correct law at the time of Petitioner's trial on November 19, 1996. *See Hughes II*, 892 So.2d at 210. n.1.

Defense counsel filed a motion to exclude the DNA evidence, and the examination of Ms. Mongtomery in support of that motion spans some seventy-two pages of testimony. (*See* Trial Tr. vol. 7, 247-319). The Court presumes that counsel's actions in challenging the evidence fall within the wide range of reasonable professional assistance or are the product of a sound trial strategy. *Strickland*, 466 U.S. at 689. Moreover, each of the allegations raised by Dr. Libby's affidavit has been countered by Ms. Montgomery's own affidavits. The evidence offered by Petitioner to discredit Ms. Montgomery's opinion is only an allegation that another opinion could have been offered. The Mississippi Supreme Court found the evidence admissible under evidentiary laws, and the State's expert has provided an explanation for each of the subsequent attacks on the testing. Petitioner has not demonstrated that the evidence produced is of such a character that it raises a reasonable probability of a different result had it been admitted, and this claim shall be dismissed.

## D. Failure to Present Evidence Undermining Selection of Venue

Ashley's body was discovered in Quitman County, but Petitioner was indicted and tried in Tate County. Petitioner maintains that no reasonable fact-finder could have concluded that this crime occurred in Tate County had trial counsel investigated and properly argued the issue of venue at trial. He maintains that if Ashley was not murdered on January 9, 1996, then no evidence links her to Tate County, the county where she was last reported having been seen. He argues that no fact-finder has ever considered whether it is true that the weather conditions preserved Ashley's body, and that had the Mississippi Supreme Court considered the facts pertaining to the unseasonably warm weather conditions at the time, they could have only reasonably concluded that Ashley was killed on or just before January 22, 1996.

On direct appeal, the Mississippi Supreme Court considered a challenge to the venue of Petitioner's trial. *See Hughes I*, 735 So.2d at 248. The trial court noted that numerous witnesses were called to demonstrate that the kidnapping began in Tate County. *See id.* at 248-49. The court determined that Petitioner's offer of another theory did not "vitiate the jury's ultimate finding that venue was indeed proper, nor d[id] it impugn the trial judge's finding that there was enough evidence presented that a rational jury could find beyond a reasonable doubt that the kidnapping did in fact begin when Galloway was lured into a pickup truck in Tate County. . .". *Id.* at 249. The court found venue proper under the State's statutes, and it rejected Petitioner's contention that Mississippi's statute governing jurisdiction where an offense occurs in multiple counties is unconstitutional. *See id.*; *see also* Miss. Code Ann. § 99-11-19.

On post-conviction review, the Mississippi Supreme Court rejected Petitioner's claim of ineffective assistance based upon the argument that venue and jurisdiction in Petitioner's case were never properly established in Tate County. *See Hughes II*, 892 So.2d at 209-10. The court found the underlying issue of venue procedurally barred, as it was raised and rejected on direct appeal. *See id.* As venue was proper in Tate County, the court noted, trial counsel was not deficient in failing to successfully challenge venue. *See id.* at 210.

After the conclusion of the State's case in chief at the guilt phase of trial, Mr. Walker, defense counsel, moved to dismiss the indictment. (*See* Trial Tr. vol. 15, 1357). He maintained that when the State sought to prove venue by circumstantial evidence, that evidence "must be absolutely inconsistent with any reasonable theory other than that sought to be proven." (*See id.* at 1360-61). He argued that the proof showed that Ashley voluntarily entered a vehicle in Tate County, and that testimony was presented to show that Ashley was attempting to get out of a

vehicle in Quitman County. (*See id.*). The trial court stated that testimony established that Ashley

Galloway got into a pickup in Tate County, Mississippi, and Investigator Sammy Webb testified

that the area was Tate County. (*See id.* at 1362). The court found that based on the evidence, "the

jury could find that Miss Galloway got into the pickup truck driven by this defendant there in the

city of Senatobia, Tate County, Mississippi. The kidnapping statute is clear. It involves not only

a forcible kidnap but by trickery or other means." (*See id.* at 1362). The court found venue

proper in Tate County since the crime commenced there, and the motion was denied. (*See id.* at

1362-63).

Walker challenged venue again in this case when he moved for a directed verdict at the

conclusion of proof at the guilt phase of trial. (*See* Trial Tr. vol. 16, 1592). Counsel argued that

Ashley was seen alive on January 11, 1996, and that she could not have therefore been kidnapped

and murdered on January 9, 1996. (*See id.*). Walker also argued that there was testimony that

Ashley had been spotted in Memphis on January 9, 1996. (*See id.*). He argued that venue was not

proper, and that the venue statutes were unconstitutional and contradictory to State and Federal

venue provisions. (*See id.* at 1592-93). The trial court denied the motion. (*See id.* at 1593-94).

On December 18, 1996, the court heard post-trial motions. (*See* Trial Tr. vol. 17, 1759-

1776). Walker moved for a new trial on numerous grounds, one of which was the court's denial

of his motion to dismiss based on the State's failure to prove venue. (*See id.* at 1760, 1764). The

court, taking all reasonable inferences from the evidence in the light most favorable to the jury's

verdict, found it "clear that this defendant inveigled and tricked the victim into getting into the

vehicle with him in Tate County, Mississippi." (*See id.* at 1774).

The length of the time until the body was discovered notwithstanding, the kidnapping of

Ashley in Tate County makes venue proper in Tate County. *See* Miss. Code Ann. § 99-11-19 ("When an offense is committed partly in one county and partly in another. . . the jurisdiction shall be in either county in which said offense was commenced. . ."). For venue to be proper in this case, the jury had to find that Ashley was murdered during the course of a kidnapping. They so found, and the evidence in sufficient to support a finding that the kidnapping began in Tate County, Mississippi. *See Hill v. State*, 797 So.2d 914, 916 (Miss. 2001) (holding that "[a]s long as the evidence is sufficient to lead a reasonable trier of fact to conclude that the crime in the present case occurred at least partly in [the county of indictment], then the evidence of venue is sufficient."). Moreover, defense counsel vigorously attacked the issue of venue in this case, and Petitioner has not demonstrated that his attack on the venue issue fell below an objective standard of reasonableness. Petitioner is not entitled to relief on this claim, and it shall be dismissed.

### E. Motion to Suppress Results of Testing Performed on Biological Evidence

Following his arrest on March 27, 1996, Petitioner executed written waiver forms authorizing the Senatobia Police Department to collect biological samples from him and search his residence and vehicles. Trial counsel challenged the consent in two separate motions, and in hearing on the motions, counsel referred to Petitioner's low IQ and mental deficiencies, but he failed to present evidence of same. The trial court ruled that Petitioner had knowingly and voluntarily consented to the taking of the samples. Petitioner maintains that the waivers were invalid due to the fact that he is mentally retarded and functionally illiterate. Petitioner argues that trial counsel performed deficiently in failing to consult an independent mental health expert to assist in proving the existence and effects of Petitioner's disabilities, as his impairments render him easy to confuse and manipulate. (*See* PCR Ex. 15, Aff. of Daniel H. Grant). Petitioner maintains

that if counsel had used expert assistance, there exists a reasonable probability that the trial court would have granted his motion to suppress the results of the testing of the DNA samples, which raises a reasonable probability of an acquittal. He also contends that the Mississippi Supreme Court's refusal to consider the merits of his challenge on post-conviction review precludes application of AEDPA deference to his claim.

On direct appeal, the Mississippi Supreme Court considered whether the trial court erred in denying Petitioner's motion in limine to suppress the tests performed upon the physical evidence seized from Petitioner on August 5, 1996. *See Hughes I*, 735 So.2d at 261-262. Petitioner argued that the waiver, allowing the taking of hair and saliva samples, was involuntary due to his inability to understand the terms of the waiver and his lack of consent to submit the samples for biological testing. *See id.* at 261. The court first noted that "voluntary" in the context of seizure of evidence may be analogized to the voluntariness issue contemplated in matters of confessions, as the issue is the lack of coercion or duress. *See id.* at 261-262. The court noted that a claim of diminished capacity depends upon "a host of factual inquiries which are best left to the first hand interpretation of the trial court judge" and found that low intelligence is merely one factor to be considered in a broader inquiry. *See id.* at 262. The court also found the trial court weighed Petitioner's low intelligence in determining that the consent was knowing. *See id.* The court noted that the trial court heard testimony concerning Petitioner's IQ at the suppression hearing, where evidence was presented that Petitioner cannot read. *See id.* The court noted that Investigator Sammy Webb testified that he read the entire waiver form to Petitioner, and that Petitioner signed the form after Webb was sure he understood the terms. *See id.* The court recited the waiver, and it found that it "strains credulity" to argue that Petitioner was unable to understand that the State was requesting

that he agree to the taking of the samples, that the purpose was to aid in the investigation of Ashley's death, and that he could refuse to give consent. *See id.* The court found the trial judge was "well within the bounds of his discretion" in finding the consent voluntary. *See id.* On post-conviction review, the court found the issue procedurally barred, as the issue was litigated at trial and on direct appeal. *See Hughes II*, 892 So.2d at 213.

Defense counsel, David Walker, brought a motion to suppress the introduction of physical evidence at a pre-trial hearing. (*See* Trial Tr. vol. 5, 100). Walker argued that Petitioner lacked the ability to knowingly and voluntarily consent based upon his mental deficiency. (*See id.*). Criminal investigator, Sammy Webb, testified that he and Senatobia Police Department Captain, Fernando Perez, met with Petitioner at the Department and requested his consent for a vehicle search and blood, hair, and saliva samples. (*See id.* at 102-03). Webb stated he was aware of "some problems that possibly existed" with regard to Petitioner's mental capabilities at the time the consent was requested. (*See id.* at 106). Webb stated he read the consent form to Petitioner slowly and filled out the form as Petitioner gave responses. (*See id.* at 104-07). Webb testified that Petitioner did not appear agitated, nervous, or upset at the time the consent was obtained, and he stated that Petitioner voluntarily came to the station in his own vehicle. (*See id.* at 107). Webb stated that Petitioner was able to communicate with the officers, and that nothing indicated to him that Petitioner did not understand what he was being asked to do. (*See id.* at 107-08). He also stated that Petitioner had not been charged with a crime at the time the consents were obtained, and that Petitioner was advised that the requests related to the investigation into the death of Ashley Galloway. (*See id.* at 108, 118). Webb stated that he explained the form to Petitioner, and that Petitioner "indicated. . . through his words and his actions that he fully understood the contents of

40

this form." (*See id.* at 111, 127).

Webb stated that several different consents were obtained from Petitioner. (*See id.* at 118-120; 121-22;125-26; 128). Webb testified that Petitioner was advised as to each that he had the right not to consent, and Webb stated that no promises, threats, or coercions were made in obtaining the consents. (*See id.* at 121; 123-24; 127; 130). On the consent to search the residence form, written below Petitioner's name was "don't do no pot or weed," and Webb testified that is what Petitioner said when asked whether he was under a substance which might impair his reasoning capabilities. (*See id.* at 123). Webb testified that another consent was obtained for the drawing of blood, hair, and saliva samples, and the form was read word for word. (*See id.* at 125). The consent form authorizing the taking of biological samples was read by Webb at the hearing:

> I, William Hughes do hereby authorize proper medical personnel to draw blood samples, take hair samples from my body, and take saliva samples. I hereby authorize that this blood, the hair samples and saliva samples be turned over to Fred Perez or Sammy Webb, being law enforcement investigators, to aid them in the investigation of the death of Ashley Galloway. I have been advised that I have the constitutional right not to have these samples taken without a search warrant, and I have been advised of my right to refuse to consent to such a search. Having been advised of these rights, I do hereby waive these rights and consent to take my blood, hair, and saliva samples. This written permission is being given by me voluntarily and without threats or promises of any kind. (*Id.* at 126).

It was signed by Hughes, Perez, and Webb. (*See id.*). Also written at the bottom of the form was a consent to the taking of photographs and fingerprints, which was requested by law enforcement officers and signed by Petitioner. (*See id.* at 125-26).

Webb also testified to the events that occurred after Petitioner was taken to the hospital to have the biological samples taken. Webb stated he read Petitioner a rights' waiver in the presence of Sheriff David Bryan, and Petitioner invoked his right to counsel at that time. (*See id.* at 133-34). Webb stated that based upon Petitioner's "reply and general demeanor," he believed that Petitioner

understood the consent to the taking of the biological samples.  (*See id.* at 138-39).

Fernando Perez, an investigator with the Senatobia Police Department also testified at the suppression hearing.  (*See id.* at 140).  He stated that he was with Webb during the questioning of Petitioner and when the consent to take samples was obtained, and that his primary role was to ensure Petitioner was transported to the hospital and back to the Department.  (*See* Trial Tr. vol. 6, 141-42).  Perez denied knowing that Petitioner was mentally deficient, and he was not aware at the time of the interviews that Petitioner had previously been institutionalized in Arkansas.  (*See id.* at 145, 148).  Perez stated that every word of the waiver forms was read to Petitioner by Webb, and that he witnessed Petitioner's signature to each consent form.  (*See id.* at 150-55).  Perez stated that he believed that Petitioner appeared to understand the questions, and he testified that Petitioner was not threatened.  (*See id.* at 151).  Perez also stated that Petitioner was informed that he had a right not to consent to the taking of the samples.  (*See id.* at 156).

Petitioner also testified at the hearing.  He testified that he was sent to a mental institution in Arkansas in the 1980's as part of a plea bargain for an Arkansas conviction, and that he obtained an IQ score of 72 on intelligence testing done there.  (*See id.* at 160-61, 196).  He stated that he received D's and F's in school before his father removed him from school in the eighth grade.  (*See id.* at 161).  He stated he could not read and write well.  (*See id*).  Petitioner admitted signing the consent forms, but he stated that he did not know what he was signing.  (*See id.* at 162-63).  He testified that he was scared that day, and that he asked for an attorney because the officers "were digging up a lot of [his] background."  (*See id.* at 163).  He stated that he could not remember how long he remained in prison on various offenses, or how long he stayed at the institution in Arkansas.  (*See id.* at 167-70).  He stated that he was shown how to do his work, and that he could not

remember the names of his medications or how long he had been taking one of them.  (*See id.* at 164-67; 172-73).

Petitioner stated that he had gotten into trouble in Arkansas on "minor stuff" for "messing with a young girl."  (*See id.* at 174).  He stated that he did not remember going in front of the judge and pleading guilty to that offense, but he did not dispute that it happened.  (*See id.* at 174-75).  He received probation on that offense, and he was at the Arkansas institution in between his arrest and his guilty plea.  (*See id.* at 175).  Petitioner stated that in March 1988, he received the same charge in Panola County.  (*See id.* at 176).  Petitioner stated he remembered pleading guilty to a fondling charge on two separate occasions, and that he did not give a statement to law enforcement officers on those charges because he invoked his right to counsel.  (*See id.* at 176-78).

Petitioner admitted that Webb read the consent forms to him prior to him signing the forms, and that he was informed that he had the right to refuse consent.  (*See id.* at 179).  Petitioner stated that there was nothing about the consent to draw blood form that he did not understand.  (*See id.* at 180, 182).  He testified that he did not really understand the consent form regarding the search of the black Ford Ranger, but that he did know he did not have to sign the form.  (*See id.* at 181).  He stated that he was not promised anything or threatened by the officers.  (*See id.* at 191).  Although his responses vacillated, Petitioner stated that he knew that the police were investigating Ashley Galloway's death when they approached him.  (*See id.* at 184-87; 192).  Petitioner stated he did not understand that he had the constitutional right not to have the samples taken without a search warrant, but that he did understand that he had the right not to give consent.  (*See id.* at 187-88).

Walker argued on the motion that Petitioner lacks the mental capacity to have consented to the searches and the taking of the samples, and that he did not consent to have tests performed on

the samples. (*See id.* at 199-203). The State argued that the presented proof showed that Petitioner was free to go at any time during the interview, and it noted that no proof of Petitioner's IQ was presented to the court. (*See id.* at 204-05). The State otherwise argued that low intelligence is just one factor to be considered in determining whether a consent is valid. (*See id.* at 205-06). The State argued that the proof showed that Petitioner had held down a job for more than a year, and that he communicated with others well enough to perform his job duties. (*See id.* at 207). The State otherwise maintained that it was clear that Petitioner understood his rights, as he invoked them later that evening, and that he had previously been involved with three other felony charges. (*See id.* at 207-08). It was also noted that a consent form was read to Petitioner on four different occasions during the interview. (*See id.* at 208-09).

The trial court found it clear that Petitioner agreed to answer questions at the Senatobia Police Department, and that he was repeatedly advised of his rights while there. (*See id.* at 212). The court noted that Petitioner admitted that he understood what was contained in the documents, and that from the court's observation of Petitioner, Petitioner was involved in his own defense. (*See id.* at 214-15). At his place of employment, the court noted, Petitioner was able to assist other employees and follow instructions. (*See id.* at 215). In addition, the court found, Petitioner was familiar with the criminal justice system, and his previous guilty pleas constituted previous findings of voluntary, knowing consent to give up his rights. (*See id.* at 216). The court noted that Petitioner later exercised his right to remain silent and to an attorney, and that Petitioner's response that he did not use dope or weed indicated that he understood the question of whether he was under a substance that would impair his reasoning capabilities. (*See id.* at 220). The court found that he was advised five different times of his rights, and that it was "without question" that Petitioner clearly

understood and freely and voluntarily gave up his rights to refuse a search and seizure of his body by way of blood, hair, and saliva samples on March 27, 1996. (*See id.* at 221-23). The court therefore denied the motion to suppress the physical evidence and the test results performed on them based upon Petitioner's voluntary consent. (*See id.*).

Petitioner argues, and this Court agrees, that the Mississippi Supreme Court does not appear to have addressed the *Strickland* claim presented to it. In post-conviction proceedings, the court addressed each ineffective assistance claim under one heading with subparts, and it addressed this claim under the heading "Search and Seizure." It did not state that it was applying *Strickland* to the claim; therefore, the Court finds that it is inappropriate to apply § 2254(d). *See Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) ("Because these claims were not adjudicated on the merits in State court. . . the heightened standard of review provided by the [AEDPA] does not apply.").

Petitioner cites *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1996) for the proposition that counsel performs deficiently in failing to acquire the information necessary to have an informed suppression hearing. However, the Court there held that where the failure to properly litigate a suppression issue is the alleged ineffectiveness, a petitioner must prove the claim has merit and that there is a reasonable probability that the verdict would have been different had the evidence been excluded. *See id.* at 375. The validity of Petitioner's consent is determined by a "voluntariness" test, which is assessed from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 219, 229 (1973). While limits on intelligence are relevant to that inquiry, a consent to search and seize need not be knowing and intelligent. *See id.* at 248, 235. Rather, the Court must consider whether coercion by officials was involved. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'

within the meaning of the Due Process Clause of the Fourteenth Amendment."). There is no evidence of coercive police activity in this case, and there is no evidence that Petitioner's mental deficiencies affected the voluntariness of his consent.

The Court finds Petitioner has not demonstrated that counsel performed ineffectively in failing to seek and present expert testimony of Petitioner's mental retardation in support of the suppression motion. Petitioner argues that counsel had the duty to seek an independent expert who would present evidence of his mental deficiencies before proceeding on the motion. However, the Court is not persuaded that even if he had procured the testimony of a doctor who would have testified to Petitioner's mental deficiencies, the results would have been different. The finding that the consent was voluntary under the totality of the circumstances has significant record support. Petitioner was employed, in a relationship, and he testified that he was not coerced. He drove to the police station in his own vehicle, stated he understood his right to refuse consent, stated he was not threatened, and later invoked his right to an attorney. Additionally, he was familiar with the legal process due to his previous arrests and pleas, and he had been found competent to plead guilty to fondling charges. Petitioner is not entitled to relief on this claim, and it shall be dismissed.

## F. Counsel's "Last-Minute" Decision to Call Petitioner to Testify in His Own Defense

Petitioner maintains that trial counsel made the last minute decision to call Petitioner to testify in his own defense when Pounders and Mosier, who trial counsel improperly subpoenaed, failed to appear to testify. Petitioner states that counsel only prepared him to testify in a fifteen or twenty minute session prior to putting him on the stand, and he presents an expert opinion that he would have needed extensive preparation prior to testifying in his own defense. Petitioner argues that counsel's decision led to prejudice when the prosecutor capitalized on Petitioner's disabilities

in order to undermine his credibility and portray him as a liar. He also argues that he is entitled to de novo review, as the Mississippi Supreme Court failed to address the prejudice prong of *Strickland* in addressing this claim, and the conclusion that he is not mentally retarded is unreasonable under clearly established precedent. Petitioner also advises the Court that he has not been able to obtain an affidavit from trial counsel corroborating Petitioner's allegations, as trial counsel has refused to cooperate with post-conviction counsel.

The Mississippi Supreme Court rejected this claim on post-conviction review, and it noted that the decision to call a witness is generally a matter of trial strategy. *Hughes II*, 892 So.2d at 210-11. The court also noted Petitioner's constitutional right to testify in his own defense. *See id.* at 211. The court also found that Petitioner was evaluated prior to trial and obtained an IQ score of 81, and that he is not mentally retarded. *See id.*

During pre-trial hearings, defense counsel, Mr. Vanderburg, put the trial court on notice of Petitioner's "possible involvement in the trial." (*See* Trial Tr. vol. 5, 69).[13] The trial court directly addressed Petitioner, informing him of his right to participate in his defense. (*See id.* at 72-73). The court informed him of his obligation to civility in his remarks, that he would be bound by the court's rulings on objections, and the court mentioned that statistically, defendants who participate in their own defenses normally do not "come out too well." (*See id.* at 76-77). The judge also informed him that if he stated a fact that was not supported through testimony or evidence, the prosecutor could argue in closing arguments that no witnesses were produced to support that

---

[13] On June 20, 1996, Petitioner filed a notice of his intention to take part in his own defense, and the trial court entered an order on September 10, 1996, granting the motion for limited involvement pursuant to the *Bevill* guidelines. (See SCP vol. 2, 228). In *Bevill v. State*, 556 So.2d 699, 710-11 (Miss. 1990), the Mississippi Supreme Court held that a criminal defendant could make an unsworn statement to the jury that was confined to the record evidence.

statement. *(See id.* at 78). Prior to the beginning of hearing evidence after the jury was selected, the trial judge informed Petitioner of his right to testify and the consequences of taking the witness stand. (*See* Trial Tr. vol. 8, 508-11). Petitioner chose to testify in his own defense. (*See* Trial Tr. vol. 12, 1478-1545).

Petitioner attached to his petition for post-conviction relief an affidavit from psychologist, Daniel H. Grant, who opines that Petitioner's deficits in expressive skills, listening comprehension skills, language skills, and short attention span predispose him to be "easily confused and [] easy to manipulate." (*See* PRC Ex. 15 at ¶¶16-17). Dr. Grant states that he would have advised against Petitioner testifying, as Petitioner's ability to understand and provide a well-reasoned response is significantly subaverage. (*See id.* at ¶18). Additionally, Dr. Grant opines that Petitioner would have needed "extensive preparation time" for direct and cross-examinations if he did testify. (*See id.* at ¶19).

In a supplemental filing to his petition for post-conviction relief, Petitioner attached his own affidavit, stating that defense counsel Walker informed Petitioner that he would have to testify after expected witnesses Pounders and Mosier did not appear. (*See* PCR Supp. Ex. 10, Aff. of William Hughes, June 15, 2001). Petitioner states that Walker told him he would need to testify, and that Walker went over potential questions with him for about fifteen or twenty minutes just prior to his testimony. (*See id.*). He states that the plan was for him not to testify up until then. (*See id.*).

The Court notes that Petitioner's self-serving affidavit is not supported by any other evidence in the record. Habeas counsel states that Petitioner's trial attorneys were uncooperative with them, but the Court cannot find a mention of an attempt to get trial counsel's affidavits during post-conviction proceedings. (*See, e.g.*, Pet. for PCR). However, even if the Court were to assume

that Petitioner's affidavit is sufficient to rebut a determination that counsel acted strategically and with reasonable professional assistance, Petitioner has not demonstrated prejudice. Petitioner's testimony comprises some sixty-seven pages of the transcript. (*See* Trial Tr. vol. 16, 1478-1545). Fifty-five pages are of Petitioner's cross-examination. (*See id.* at 1486-1541). The Court has reviewed the entire testimony and is not aware of what additional preparation would have yielded to prevent prejudice. Defense counsel could not have prepared away Petitioner's prior statements to law enforcement or the statements of other witnesses in the case concerning, for example, what truck Petitioner normally drove to work. Petitioner has failed to demonstrate that a reasonable probability of a different outcome exists had he not testified, or if he had testified with more preparation. This claim shall be dismissed.

## G. Cumulative Acts/Omissions

Petitioner maintains that the cumulative effect of the deficient acts and omissions of trial counsel requires the Court to find that there is a reasonable probability that the results of the trial would have been different but for the performance of counsel. The Mississippi Supreme Court found that as there were no errors in any of Petitioner's ineffective assistance of counsel claims, there could be no error in the whole. *See Hughes II*, 892 So.2d at 213. There can be no aggregate error where the individuals claims presented are without error of constitutional dimension. *See Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007). Petitioner did not receive any unfair trial as the result of the representation he received, regardless of arguable deficiencies in the performance of trial counsel. In short, Petitioner did not suffer prejudice, and this claim is without merit. *See Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (holding cumulative error of counsel did not warrant COA where none of the errors satisfied *Strickland*'s prejudice prong). This claim shall be

dismissed.

## Certificate of Appealability

Under the AEDPA, a petitioner must obtain a certificate of appealability ("COA") before he can appeal this Court's decision. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which Petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must also demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. A district court may deny a COA without requiring further briefing. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue, determines that Petitioner has not demonstrated that reasonable jurists would debate its procedural or substantive rulings on the claims raised by Petitioner. Therefore, a certificate of appealability will not issue from this decision.

## Conclusion

For the reasons stated herein, Petitioner is entitled to have his sentence of death vacated pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Chase v. State*, 873 So.2d 1013 (Miss. 2004). This Court will issue a Writ of Habeas Corpus unless, within sixty days of the date the Judgment in this case becomes final, the State of Mississippi vacates Petitioner's death sentence and imposes a sentence less than death. The remainder of Petitioner's claims do not warrant federal habeas corpus relief and shall be dismissed. A separate judgment in accordance with this opinion

shall issue today. Accordingly, it is hereby **ORDERED** that:

1. Relief on Petitioner's claim of mental retardation is **GRANTED**, and this Court will issue a Writ of Habeas Corpus unless, within sixty days of the date the Judgment in this case becomes final, the State of Mississippi vacates Petitioner's death sentence and imposes a sentence less than death.

2. Petitioner is **DENIED** an evidentiary hearing on his remaining claims.

3. All other federal habeas corpus relief requested by Petitioner is **DENIED**, and the remaining claims in the petition shall be **DISMISSED** with prejudice.

4. All pending motions are **DISMISSED** as moot.

5. Petitioner is **DENIED** a Certificate of Appealability on all claims raised in the petition not related to the sentencing phase of his trial.

6. A separate Judgment in conformity with this Opinion and Order shall issue today.

      **SO ORDERED**, this the 3rd day of March, 2010.


                        **S/SHARION AYCOCK**
                        **SHARION AYCOCK**
                        **UNITED STATES DISTRICT JUDGE**